02-11-229-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00229-CV

 

 


 
 
 Jayson Steele
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 City of Southlake, Texas, and Wade Goolsby, in his
 official capacity as Chief of Police Southlake Department of Public Safety
 
 
  
 
 
 APPELLEES
 
 


 

----------

 

FROM THE 96th
District Court OF Tarrant COUNTY

----------

 

OPINION

----------

          In
four issues, appellant Jayson Steele appeals the trial court’s order granting
the motion for summary judgment and plea to the jurisdiction of appellees City
of Southlake, Texas (Southlake) and Wade Goolsby, in his official capacity as
chief of police for the Southlake Department of Public Safety (SDPS).  We
affirm.

Background
Facts

          Appellant
worked for Southlake as a police sergeant with a primary responsibility of patrol. 
In 2005, Goolsby, who was licensed as a police officer in 1980, became Southlake’s
Chief of Police Services.

          According
to appellant, in 2006, he began to learn about possible crimes being committed
by employees of Southlake’s police department.  For example, appellant heard
that a sergeant had forced a detective to change information in an offense
report, and appellant believed that this act comprised official oppression or
tampering with a governmental record.[1]  Appellant also believed
that the department had set up an improper system of evaluating officers by the
number of citations that they had issued.[2]  Based on instances occurring
in 2006 and 2007, which appellant described in an affidavit, he further believed
that a pattern was developing of supervisors improperly interfering with cases,
recalling cases that had already been submitted to the Tarrant County District
Attorney, suggesting “in-house probation” for offenders, and “selectively
enforcing the law” when the suspects were prominent members of the community or
students of Southlake Carroll High School.  Appellant says that through an
anonymous survey, he reported some of his complaints about these actions to
City Manager Shana Yelverton.  Appellant also discussed the alleged
improprieties with Lieutenant Michael Kenny.

          In
the summer of 2007, a group of Southlake’s police officers, including
appellant, approached the Tarrant County District Attorney’s Office with
concerns about Chief Goolsby’s handling of police incidents and investigations. 
Appellant asserts that he made good faith reports of misconduct to an investigator
with the district attorney’s office and two Texas Rangers’ sergeants.  In
addition to some of the facts discussed above, appellant told the investigator
about how Chief Goolsby allegedly told officers to falsify workers’
compensation claims when they were injured in off-duty jobs.  The district
attorney’s office investigated the concerns.[3]  A grand jury listened to
witnesses speak about the department’s alleged improprieties, but the grand
jury did not issue criminal charges.

          In
October 2007, appellant and Southlake’s Director of Public Safety Jim Blagg[4]
exchanged e-mails about appellant’s concern that Chief Goolsby endorsed
“unethical” behavior.  Blagg wrote to appellant that appellant’s “snipping and
knit-picking every word that anyone in a Supervisory role in [S]DPS sa[id] or [wrote
was] causing continuous strife that [was] unnecessary.”  Appellant says that
after his exchange with Blagg, Chief Goolsby changed appellant’s work status to
a “less desirable position.”

          On
January 9, 2008, Southlake’s mayor, Andy Wambsganss, along with one of Southlake’s
city council members, Laura Hill, received an e-mail from someone who
identified himself only as “SDPS Officer.”  The e-mail, which was sent from
southlakeneedshelp@live.com, contained information on SDPS personnel that Councilmember
Hill believed was confidential and should not have been disclosed.[5]
 Specifically, the e-mail stated in part,

As you may or may not
know, Lt. Michael Kenny was fired today.

          This is a
great injustice as he was one of the major forces behind exposing the wrong
doing being conducted by our police administration.  Cases have been dropped or
lowered without just cause.  The cases were not mishandled.  There were not any
obstacles to prosecution.  They were simply interfered with.  The fact that the
parents of the children involved are high profile certainly adds an air of suspicion
as to the motives Chief Goolsby has for interfering because there are no other
reasons.  In fact, there [is] a series of lies that have been spoken by Chief
Goolsby that are being investigated by a Tarrant County Grand Jury as to why
one of these cases was dropped.  Lt. Kenny gave Assistant City Manager Blagg
proof of these lies . . . .  Instead of acting on this proof, Blagg has buried
it and ignored it.

          Lt. Kenny gave Blagg written proof that Chief
Goolsby used city personnel, services, and equipment for personal gain. . . .

          Lt. Kenny was on paid administrative leave for
over three months after he made the claim which was later substantiated by
Blagg and for which Goolsby received a verbal reprimand. . . .  Now Goolsby’s
$5.00 theft has cost the city tens of thousands to cover up.  Besides, theft is
theft.  If your police chief is comfortable stealing any amount, you should
have a problem with that.  All of this was done while Lt. Kenny was an active
witness of a Grand Jury investigation. . . .

          City administrators are acting like children
hiding their report cards from the parents.  Only in this case, you are the
parents.  Officers have brought allegations of case fixing, orders to violate
the civil rights of citizens, ticket quotas, inefficiency, and incompetence to
Blagg . . . .  Nothing was investigated. . . .  Blagg does not want to know the
real problems.  Neither does [Yelverton].  They do not want you to know either.
. . .

          . . . .

          So far in the last couple of years that they
have been here, Blagg and Goolsby have brought shame and embarrassment to the
city by the appearance of inappropriate relationships influencing hiring, Blagg
paying himself to hire himself, a Grand Jury investigation, and lies made in
print and on television regarding an inappropriately dropped case.  Chief
Goolsby appeared in two endorsements for Roxanne Taylor Realty in full police
uniform, in violation of police department and city policy . . . .[[6]] 
Goolsby tells Blagg he didn’t know the commercial was being shot and he just
walked in on accident . . . .

          . . . .

          The city advertises I2ACT as [its] slogan for
core values to its employees.  Integrity is the first word in that slogan and
it very well should be.  City administration preaches integrity and yet covers
the truth when it is brought to their attention.  Integrity for all but the
police chief who should be the most honest and unimpeachable in the entire
city. . . .

          The police department is in poor shape and [is]
getting worse.  Approximately 25% of the police department [is] either retiring
or looking elsewhere for jobs.  That number will grow if indictments are not
returned by the Grand Jury.  Many have lost faith in the city altogether after
repeated attempts to report their activities have been met with indifference
and retaliation.  Chief Goolsby recently hired a police recruit . . . that had
been caught smoking marijuana in his car while he was employed as a corrections
officer . . . .  [A sergeant] was recently investigated by the DEA for
purchasing Human Growth Hormone illegally over the internet.  He claimed to not
know that it was illegal to do so and that it was medically necessary for him.
. . .

          The DEA has turned him as a witness for the
prosecution against the online pharmacy.  However, he was not disciplined by
Chief Goolsby.  Is this the message that Southlake wants to send to [its]
youth? . . .

          I don’t know what relationships the city
administrators have that have caused them to circle the wagons so fiercely and
protect the criminal activities that have occurred but, regardless if
indictments are returned, the Grand Jury investigation will be public record
and the testimony of your officers will shock you and your constituents.

          Councilmember
Hill provided a copy of the e-mail to SDPS so that it could look into the
e-mail’s allegations and determine whether someone had improperly accessed
confidential information.[7]  Chief Goolsby received
the e-mail.  He believed that the e-mail disclosed confidential information and
that the department needed to learn who sent it to discern whether a security
breach had occurred.  He also believed that the facts recited in the e-mail
were incomplete and misleading.

          Captain
Rusty Daniels led an investigation into the source of the e-mail and into how
that source had learned about the issues addressed in the e-mail.[8] 
He interviewed several of the police department’s employees, who all denied
having any knowledge about who sent the e-mail, and he required many employees to
answer written questions about the sending and content of the e-mail.  According
to Captain Daniels, the investigation into the anonymous e-mail required a
“very substantial expenditure” of his time.

          On
January 23, Mayor Wambsganss and Councilmember Hill received another email from
southlakeneedshelp@live.com.  That e-mail, which purported to be sent by
retired police officer Quentin Watkins, stated,

          I sent my letter to you so that you would see
the truth.  My feelings about you were apparently wrong.  I left the
department last year.  I left because of the reasons I wrote about and others.  I figured
if I told you that you would see me as an ex-employee with a grudge.  I hear
that you just turned this information over to city management who . . . started
a witch hunt in the police department.  What you are allowing to happen to [Lt.
Kenny] is wrong but I guess you will figure that out when it goes to court.

Captain
Daniels spoke to Watkins, and Watkins said that he had not sent the e-mails.  Watkins
said that appellant had asked permission to use Watkins’s name to send the
second e-mail but that he had not given appellant permission.  On January 25,
Watkins sent a notarized memo to Captain Daniels that stated in part,

I have no idea what was said in either email because I
did not write them.  I told Capt. Daniels that I had been contacted by
[appellant] by phone earlier in the week at which time [appellant] told me that
an email had been sent to a City [councilmember] and now [SDPS] management was
coming down hard on . . . personnel attempting to find out who wrote the
email.  [Appellant] said that there was an internal affairs investigation being
conducted and that those involved in the email . . . could be in a lot of
trouble.  [Appellant] went on to ask if he could write an email using my name .
. . .

          . . . .

          I did not give anyone permission to use my name
in any email sent to the City of Southlake or to a City [councilmember].

          Captain
Daniels asked appellant to answer several questions about the e-mails in
writing, and appellant did so on January 29.  He admitted to sending the
e-mails and stated that he had received permission to use Watkins’s name.[9] 
Also on January 29, an attorney wrote a letter to Chief Goolsby to state that
he had been retained by appellant and to express his belief that appellant was
protected by the Whistleblower Act.[10]  Part of the letter
stated, “I certainly hope that the City and/or the Department and yourself will
not retaliate against Sgt. Steele for the information he has provided to the
Tarrant County District Attorney’s Office.”  Captain Daniels also interviewed
appellant more than once.  Appellant said that he had used Watkins’s name for “self
preservation” because he knew that the investigation was “closing in on him.”  He
expressed his belief that Watkins had denied granting appellant permission to
use Watkins’s name because Watkins was running for a political office.

          SDPS
placed appellant on administrative leave with pay and benefits and precluded
him from performing any police work.  On February 5, Captain Daniels formally
asserted fifteen potential grounds for misconduct against appellant associated
with appellant’s sending of the e-mails.  Captain Daniels classified the
fifteen grounds into appellant’s alleged violations of four of SDPS’s written policies
that

·       
prohibited
unbecoming conduct, including “discourtesy or conduct which [brought] the
department into disrepute or reflect[ed] discredit upon the individual as an
employee of [SDPS], or that which impair[ed] the operation or efficiency of the
Department or individual”;[11]

 

·       
required
SDPS employees to be truthful in all verbal statements and written
documentation because truthfulness was “essential and expected when dealing
with a single employee or the public”;[12]

 

·       
required
SDPS employees to follow federal, state, and local laws;[13]
and

 

·       
mandated
that employees could not disseminate confidential information to unauthorized
people for any purpose.[14]

          Appellant
responded in writing to Captain Daniels’s fifteen allegations of misconduct on
February 7.  Among other parts of his response, appellant expressed his beliefs
that information he had included in the January 9 e-mail was public information
under chapter 552 of the government code, that he was authorized to disclose
the information to city officials under Southlake’s employee handbook because
the information concerned illegal or unethical conduct and violations of
Southlake’s policies, that he had not been told by anyone to not release the
information, that he had not “released” confidential information at all because
he did not send the e-mails to anyone outside of Southlake’s government, and that
Watkins had allowed him to use Watkins’s name to send the second e-mail.  One
of Captain Daniels’s fifteen allegations stated, “On January 23, 2008[,] you
were untruthful when you sent a second email to the City of Southlake Mayor and
Councilmember Laura Hill taking responsibility for sending the first email,
however claiming to be retired Southlake Officer Quentin Watkins.”  Appellant
responded to this allegation by stating, “Given the lengths to find me, I think
my response was justified.”  The last paragraph of appellant’s response stated,

I find it interesting that I am being charged with 15
separate counts of policy violations and yet most of the issues I brought forth
in my email have been completely ignored.  I have report[ed] policy violations,
ethics code violations, and violations against the laws of the State of Texas,
all in good faith, and yet I am the one being investigated.

Captain
Daniels eventually recommended that thirteen of the fifteen grounds be
sustained.

          The
“Complaint Summary” portion of Captain Daniels’s written investigation report
stated,

          On January 9, 2008[,] an email was received by
a member of the Southlake City Council which contained confidential information
concerning the background of SDPS Police Services personnel, internal affairs
investigations, disciplinary actions taken, the identity of witnesses involved
in [ongoing] criminal cases, and information concerning a Tarrant County Grand
Jury investigation.  It also contained information purported to be fact that
actually was false or misleading.  In addition to the information released,
there were numerous derogatory comments concerning the integrity of the City
Manager, Director of Public Safety, and the Chief of Police.

          Due to the nature of the confidential
information released, an administrative review was initiated.  The scope of the
review was to determine the identity of the person responsible for composing
and sending the email.  On January 18, 2008[,] interviews with SDPS personnel
began.  On January 23, 2008[,] a second email was received.  In this email, the
composer identified [himself] as retired Southlake Police Officer Quentin
Watkins.

          As a result of this investigation, the composer
of both emails was identified as [appellant].  As a result of [appellant’s] actions,
it was alleged he violated SDPS policy, thus the ongoing administrative review
was changed to an internal affairs investigation.

Captain
Daniels’s report then detailed the contents of various statements that he had
received from witnesses who he had talked to in the investigation, including appellant,
Watkins, Councilmember Hill, and Blagg.

          Chief
Goolsby asked Lieutenant Ashleigh Douglas, appellant’s supervisor, to review
Captain Daniels’s investigation report and provide her opinions on the allegations
it contained.  On March 3, 2008, Lieutenant Douglas issued a memo stating that
she had reviewed Captain Daniels’s report.  Lieutenant Douglas opined that eight
of Captain Daniels’s alleged grounds of appellant’s misconduct be sustained,
including two of the grounds relating to appellant’s untruthfulness, but she
recommended demotion, rather than termination, as appellant’s discipline.  Lieutenant
Douglas recognized that the “operation and efficiency of the Department was
temporarily impaired when several supervisory members of the department were
diverted from their normal duties to conduct the investigation and subsequent
reviews of the investigation.”  Appellant says that Lieutenant Douglas told him
that Chief Goolsby tried to get her to alter her recommendation of demotion.

          On
March 4, 2008, appellant submitted a hostile work environment complaint to
Yelverton.  The complaint alleged several incidents of misconduct by SDPS, some
of which appellant stated that he had already reported to the district attorney’s
office, including that

·       
in
December 2006, a sergeant made a detective change parts of a report to reflect
a lower charge for a robbery at a Wendy’s restaurant, which appellant believed
could qualify as official oppression under the penal code;

 

·       
in
May 2007, a sergeant repressed the investigation of a drug case although the
evidence supported a charge;

 

·       
in
May 2007, a sergeant improperly influenced the lowering of a charge after a
detective had already filed a case with the district attorney’s office;

 

·       
Chief
Goolsby provided false excuses to officers about why the Tarrant County
District Attorney’s office had not prosecuted cases;

 

·       
Chief
Goolsby and Captain Daniels ordered supervisors to evaluate officers based on
the number of citations that they issued each month;

 

·       
Chief
Goolsby tampered with a governmental record in connection with appellant’s 2005
performance appraisal;

 

·       
during
an August 2007 meeting, Chief Goolsby implied that officers should conceal
their off-duty status if they got injured while working off duty so that they
could collect workers’ compensation benefits;

 

·       
Chief
Goolsby suppressed an investigation into the circumstances of someone’s death
when detectives believed that the death was suspicious; and

 

·       
appellant
disclosed allegations about Chief Goolsby’s misconduct to Blagg, but Blagg
“never sought trained criminal investigators to look into these allegations.”

          In
the complaint, appellant also expressed his opinions that in several
circumstances, he was treated unfavorably for reporting these allegedly
unethical behaviors by officers in the department and that the allegations of
misconduct that had been made against him were retaliation for the allegations
that he had made against the police administration.  Yelverton had received the
district attorney’s report by the time appellant presented his hostile work
environment complaint.

          Yelverton
appointed Marigny Lanier, an attorney, to investigate the hostile work
environment complaint.[15]  On March 16, 2008,
appellant sent a memo to Yelverton titled, “Hostile Work/Harassing Environment
Complaint Amendment.”  In the memo, appellant alleged that Chief Goolsby had
discussed details of the internal affairs investigation concerning appellant
with other officers.  Appellant stated that “[i]nternal affairs investigations
. . . are protected against the information being distributed to preserve the
integrity of the investigation.”  Between March 24 and April 17, Lanier
interviewed appellant, Blagg, Captain Daniels, Chief Goolsby, Lieutenant Kenny,
Yelverton, and others.  Appellant claims that Lanier did not adequately
investigate his complaint.

          Chief
Goolsby reviewed Captain Daniels’s report and Lieutenant Douglas’s review of
the report.  Chief Goolsby issued a memo that sustained six of the fifteen
allegations of misconduct, including allegation number ten, concerning
“Truthfulness,” because Chief Goolsby found that appellant had “intentionally
used another person’s name as the author of an e-mail in order to avoid detection
and divert attention.”  Chief Goolsby also sustained all four of the
“Unbecoming Conduct” allegations, stating that appellant’s “statements of
‘fact’ were based on rumors, opinions, and third-party information” and that
the method appellant used to express his concerns was “unprofessional and
inexcusable.”  Chief Goolsby fired appellant in May 2008.

          On
May 8, 2008, Yelverton informed appellant by a letter that Lanier had completed
her investigation and that based on Lanier’s written report, Yelverton had
found that appellant had not been subjected to a hostile work environment in
retaliation for reporting his concerns about Chief Goolsby.  In the report, Lanier
concluded that appellant had not made good faith reports of violations of law,
although Lanier said, with respect to appellant’s claim that Chief Goolsby had imposed
a ticket quota, that the good faith issue was a “close question.”  Lanier also
determined that appellant had not suffered discriminatory and adverse personnel
actions or harassment because of the reports he had made; she found appellant’s
arguments in that regard to be speculative.

          Through
Southlake’s grievance policy, on May 15, appellant appealed Chief Goolsby’s
termination decision to Blagg, although appellant objected to Blagg deciding
the appeal because Blagg had been named in appellant’s hostile work environment
claim.  Blagg declined to recuse himself because he believed he could act
fairly toward appellant.  As part of the appeal, appellant criticized much of
Captain Daniels’s report and alleged that Watkins had allowed him “to use [Watkins’s]
name regardless of what pressure from the department made him recant.”[16]
 On June 10, Blagg met with appellant, appellant’s attorney, Southlake’s
attorney, and a human resources analyst.  Blagg also considered Daniels’s
report and Douglas’s review of Daniels’s report.  On June 13, Blagg sustained
appellant’s termination on the bases that (1) appellant had intended to deceive
the department with his e-mails and to “interfere with or prevent the
department from ascertaining the identity of the author of the [January 9] email”;
and (2) in the January 9 e-mail, appellant had made “purportedly factual
statements based on rumor and hearsay, something a reasonable officer should
know to avoid.”  Blagg sustained six of the fifteen grounds for misconduct that
Captain Daniels had asserted.

          Appellant
appealed Blagg’s decision to Yelverton.  On June 20, appellant sent a memo to
Yelverton to argue for his reinstatement.  The memo included appellant’s
assertions that Lanier’s investigation had been “wrought with errors.”  In the
memo, appellant also said, “I know that I have made mistakes in this
situation[,] but there is not a single person involved in this series of
incidents that can claim innocence of all fault.”  Appellant met with Yelverton
on July 22, and several days later, after Yelverton had interviewed Watkins and
had considered Captain Daniels’s report, Lieutenant Douglas’s review, and the
termination findings of Chief Goolsby and Blagg, Yelverton upheld the
termination.  According to her affidavit, her decision was based on the tenth
and eleventh allegations of misconduct that Captain Daniels had generated,
which both concerned untruthfulness.  In the affidavit, Yelverton said that the
investigation into the source of the e-mails was required to determine whether
there had been a breach of security.  She also noted that appellant’s actions
in sending the e-mails were “deceptive whether or not he had [Watkins’s]
permission.”

          In
August 2008, appellant sued Southlake “for retaliating against him” in
violation of the Whistleblower Act.  Appellant asserted that his reports about
SDPS’s alleged misconduct caused his termination, and he sought compensatory
damages, reinstatement as a sergeant, and attorney’s fees.  Appellant later
amended his petition several times; among other effects, the amendments added Chief
Goolsby as a defendant.

          In
December 2010, in one document, appellees filed a motion for summary judgment
and a plea to the jurisdiction.  In their motion, appellees contended in part that
appellant had been fired because he was untruthful when sending the January
2008 e-mails rather than because of the substance of his reports about SDPS’s
alleged wrongdoing.  Appellees also asserted that appellant had no evidence to
support his claims.  Appellant responded to appellees’ motion and plea,
contending that he was “ultimately terminated for making the report of criminal
violations against [Chief Goolsby] and other employees to the Tarrant County
District Attorney.”

          Appellees
objected to much of appellant’s summary judgment evidence, including almost all
of appellant’s affidavit, and appellees noted that appellant had not contested
that his termination would have occurred regardless of his status as a
whistleblower.  The trial court sustained several of the objections, granted
appellees’ motion for summary judgment and plea to the jurisdiction without
specifying a reason for doing so, and dismissed all of appellant’s claims with
prejudice.  Appellant brought this appeal.[17]

Appellant’s Whistleblower Act Claim

          In
his second issue, appellant argues that appellees did not conclusively establish
their affirmative defense and that the trial court therefore erred by granting their
motion for summary judgment.  We review a summary judgment de novo.  Travelers
Ins. Co. v. Joachim, 315 S.W.3d 860, 862 (Tex. 2010).  We consider the
evidence presented in the light most favorable to the nonmovant, crediting
evidence favorable to the nonmovant if reasonable jurors could, and
disregarding evidence contrary to the nonmovant unless reasonable jurors could
not.  Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding, 289
S.W.3d 844, 848 (Tex. 2009).  We indulge every reasonable inference and resolve
any doubts in the nonmovant’s favor.  20801, Inc. v. Parker, 249 S.W.3d
392, 399 (Tex. 2008).  A defendant is entitled to summary judgment on an
affirmative defense if the defendant conclusively proves all the elements of
the affirmative defense.  Frost Nat’l Bank v. Fernandez, 315 S.W.3d 494,
508–09 (Tex. 2010); see Tex. R. Civ. P. 166a(b), (c).  To accomplish
this, the defendant-movant must present summary judgment evidence that conclusively
establishes each element of the affirmative defense.  See Chau v. Riddle,
254 S.W.3d 453, 455 (Tex. 2008).

          Once
the defendant produces sufficient evidence to establish the right to summary
judgment, the burden shifts to the plaintiff to come forward with competent
controverting evidence that raises a fact issue.  Van v. Pena, 990
S.W.2d 751, 753 (Tex. 1999); Rice v. Metro. Life Ins. Co., 324 S.W.3d
660, 665 (Tex. App.—Fort Worth 2010, no pet.).  When a trial court does not
specify the ground relied on for granting summary judgment, the summary
judgment will be affirmed on appeal if any of the theories presented to the trial
court and preserved for appellate review are meritorious.  Hanson v.
Greystar Dev. & Constr., LP, 317 S.W.3d 850, 852 (Tex. App.—Fort Worth
2010, pet. denied).

          “A
state or local governmental entity may not suspend or terminate the employment
of, or take other adverse personnel action against, a public employee who in
good faith reports a violation of law[[18]] by the employing
governmental entity or another public employee to an appropriate law
enforcement authority.”  Tex. Gov’t Code Ann. § 554.002(a); see City of El
Paso v. Parsons, 353 S.W.3d 215, 225 (Tex. App.—El Paso 2011, no pet.).  A
violation of section 554.002 waives governmental immunity.  State v. Lueck,
290 S.W.3d 876, 878 (Tex. 2009); see Tex. Gov’t Code Ann. § 554.0035; Tex.
Dep’t of Assistive & Rehabilitative Servs. v. Howard, 182 S.W.3d 393,
396 (Tex. App.—Austin 2005, pet. denied).  A person whose employment is
terminated in violation of section 554.002 may sue for injunctive relief,
reinstatement, damages, and reasonable attorney’s fees.  Tex. Gov’t Code Ann. §
554.003.  The person must generally sue within ninety days of the improper
employment action.  Id. § 554.005.

          Among
other grounds, appellees sought summary judgment on the affirmative defense
described by section 554.004(b) of the government code, which states,

It is an affirmative defense to a suit under this chapter
that the employing state or local governmental entity would have taken
the action against the employee that forms the basis of the suit based solely
on information, observation, or evidence that is not related to the fact
that the employee made a report protected under this chapter of a violation
of law.

Id. §
554.004(b) (emphasis added).  Appellees argued in the trial court that
appellant’s “deceptive actions in the face of an official investigation would
have inevitably caused a termination of his employment.”  In appellant’s
response to appellees’ motion, he generally asserted that he could produce
evidence of his claims and stated that he was “ultimately terminated for making
the report of criminal violations against the Chief and other employees to the
Tarrant County District Attorney,” but he did not specifically respond to
appellees’ ground for summary judgment under section 554.004(b)’s affirmative
defense.[19]

          The
affirmative defense in section 554.004(b), if proven, tends to negate the
causation element of a plaintiff’s claim because to show causation in a
Whistleblower Act case, “a public employee must demonstrate that after he
reported a violation of the law in good faith to an appropriate law enforcement
authority, the employee suffered discriminatory conduct by his employer that
would not have occurred when it did if the employee had not reported the
illegal conduct.”  Hurley v. Tarrant Cnty., 232 S.W.3d 781, 786
(Tex. App.—Fort Worth 2007, no pet.) (emphasis added); see City of Fort
Worth v. Zimlich, 29 S.W.3d 62, 68 (Tex. 2000); Tex. Dep’t of Human
Servs. v. Hinds, 904 S.W.2d 629, 636 (Tex. 1995) (“[T]he standard of
causation in whistleblower and similar cases should be that the employee’s
protected conduct must be such that, without it, the employer’s prohibited
conduct would not have occurred when it did.”).[20]
 This causation standard has been described as a “but for” causal nexus
requirement.  Hurley, 232 S.W.3d at 786 (citing Rogers v. City of
Fort Worth, 89 S.W.3d 265, 280 (Tex. App.—Fort Worth 2002, no pet.)).

          Typically,
a causal link between the employee’s report of illegal conduct and the adverse
employment action may be established by circumstantial evidence, including knowledge
of the report of illegal conduct, expression of a negative attitude toward the
employee’s report of the conduct, failure to adhere to established policies
regarding employment decisions, discriminatory treatment of the reporting
employee in comparison to similarly-situated employees, and evidence that the
stated reason for the adverse employment action was false.  Parsons, 353
S.W.3d at 226 (citing Zimlich, 29 S.W.3d at 69); Hurley, 232
S.W.3d at 786.  On appeal, appellant relies on such evidence; he asserts, among
other facts, that

·       
during
his investigation, Captain Daniels knew of appellant’s reports of allegedly illegal
conduct by SDPS employees to the district attorney; at the time of their successive
termination decisions, Chief Goolsby, Blagg, and Yelverton also knew of appellant’s
involvement in making the reports; and Chief Goolsby, Blagg, and Yelverton were
aware of the January 9 e-mail that appellant sent, which contained complaints
against each of them;

 

·       
in
their summary judgment affidavits, Yelverton, Blagg, Chief Goolsby, and Captain
Daniels described appellant’s anonymous January 9, 2008 e-mailed whistleblower
report as a deceptive act, which implies that they viewed the report negatively;
and Blagg’s October 2007 e-mail exchange with appellant, in which Blagg said
that appellant was “knit-picking,” also shows that Blagg viewed whistleblower
reports negatively;

 

·       
although
Chief Goolsby usually did not discuss internal affairs investigations, he
discussed appellant’s investigation with other SDPS employees; and during
Captain Daniels’s investigation, Captain Daniels did not provide appellant with
an opportunity to take a polygraph test concerning whether Watkins gave consent
to use his name in the January 23, 2008 e-mail even though under a general
order, Captain Daniels had the authority to do so; and

 

·       
by
describing the January 9 e-mail as deceptive, Yelverton conceded that the
anonymous whistleblower report itself was a cause of the termination decision;
and although Captain Daniels, Chief Goolsby, and Blagg claim to have not known
about appellant’s report of misconduct to the district attorney, other facts
show that they knew of the report, and their “conscious attempt to hide their
knowledge . . . shows that the whistleblower report was a factor in their
investigation and decision to terminate” appellant.[21]

          It
is possible that these facts amount to circumstantial evidence showing that
appellant’s reports of misconduct provided one basis for appellees’ decision to
fire appellant.  Under the plain language of section 554.004(b),[22]
however, appellees are nonetheless entitled to their affirmative defense if the
decision to fire appellant would have been made solely on a basis that
is independent of the fact of the reports.  Tex. Gov’t Code Ann. § 554.004(b). 
Appellant correctly notes that the Whistleblower Act does not require an
employee to prove that the reporting of illegal conduct was the sole reason for
the complained-of adverse employment action.  Hurley, 232 S.W.3d at 786. 
Thus, if the employee’s report would not have been enough by itself to cause
the employer’s adverse employment action but was an indispensible component, in
combination with other facts, of the action, then the report caused the action
under the Whistleblower Act.  See id.  If, however, the evidence conclusively
establishes that any possible consideration by the employer of the fact that
the employee made a report was only superfluous to the adverse employment
action and that the action would have occurred regardless of the fact of the
report, then section 554.004(b)’s affirmative defense precludes liability.  See
Tex. Gov’t Code Ann. § 554.004(b).

          The
supreme court demonstrated this principle in Haggar Clothing Co. v.
Hernandez, in which the court examined causation under a statute that
precludes retaliatory discharges and is therefore similar to the Whistleblower
Act.  164 S.W.3d 386, 388 (Tex. 2005).[23]  Hernandez was injured
while working for Haggar as a seamstress.  Id. at 387.  After Hernandez did
not return to work for more than a year following her injury, Haggar fired her
under a leave-of-absence policy that provided that the “maximum amount of time
an employee could remain on leave, regardless of the reason, was one year.”  Id. 
Hernandez sued Haggar, alleging that she had been fired for filing a workers’
compensation claim after she had been injured, and although a jury rendered a
verdict in her favor and a court of appeals affirmed the trial court’s judgment
on the verdict, the supreme court reversed on the ground of legal
insufficiency.  Id.  That court explained,

          In affirming the trial court’s judgment, the
court of appeals focused heavily on evidence Hernandez presented that Haggar’s
safety-incentive policies, which included bonus opportunities for units that
had accumulated a certain number of hours without a “lost-time accident” that
required an employee to miss work, pressured employees not to report workplace
injuries for fear of upsetting co-workers.  Hernandez also presented evidence
that plant managers were under economic pressure to minimize workers’
compensation claims, that she had felt pressured to remain at work the day of
her accident, and that [Haggar’s plant manager] had threatened not to pay for
her treatment by a chiropractor the day after the accident.  This may
constitute circumstantial evidence supporting a causal link between Hernandez's
termination and her filing a workers' compensation claim.  We held in Cazarez,
however, that an employer who terminates an employee pursuant to the uniform
enforcement of a reasonable absence-control provision will not be liable for
retaliatory discharge.  The above evidence is thus immaterial if
Hernandez’s termination was required by the uniform enforcement of Haggar’s
one-year leave-of-absence policy.

Id. at
388 (emphasis added) (citations omitted).  Following Hernandez, courts
of appeals, including our own court, have held that circumstantial evidence of
retaliation is immaterial when an employer proves an independent basis for an
adverse employment action.  See Parker v. Valerus Compression Servs., LP,
No. 01-10-00916-CV, 2011 WL 3918159, at *5–6 (Tex. App.—Houston [1st Dist.]
Aug. 25, 2011, pet. denied) (stating that when an employer proves a uniform,
independent basis for termination, the terminated employee “must provide
competent evidence that the employer treated him differently from similarly
situated employees in order to survive a summary judgment motion”); Alonso
v. Stanley Works, Inc., 111 S.W.3d 850, 851–52 (Tex. App.—Dallas 2003, no
pet.); see also Jackson v. FedEx Ground Package Sys., Inc., No. 02-07-00246-CV,
2008 WL 1867931, at *4–6 (Tex. App.—Fort Worth Apr. 24, 2008, no pet.) (mem.
op.) (affirming a summary judgment in favor of an employer because the
employer’s post-injury drug screening policy, which the employee did not comply
with, comprised an independent ground for termination).

          In
his brief, appellant states that his termination was “centered on his sending
of the January 23, 2008” e-mail, which he says was an attempt to preserve his
anonymity.  He concedes that the January 23 e-mail implied that Watkins wrote
the January 9 e-mail.  Regardless of whether Watkins gave appellant permission
to associate Watkins’s name with the January 23 e-mail (which is a disputed
fact), appellant’s statement in the January 23 e-mail that Watkins had written
the January 9 e-mail was intentionally false; it was, as appellant admitted, an
attempt to divert Captain Daniels’s investigation.

          An
SDPS employee’s violation of a general order may result in “counseling,
reprimand, suspension, and/or dismissal.”  One general order states that a
Southlake police officer should be “[h]onest in thought and deed in [the
officer’s] personal and official life.”  Another order states, “One of the
standards of ethical conduct is truthfulness.  Truthfulness is essential and
expected when dealing with a single employee or the public.”  Yet another general
order classifies untruthfulness as a “Class One Complaint” that must be
investigated according to internal affairs procedures.  Although SDPS’s policy
provides for differing levels of discipline, a general order states, “It is
recognized that it may occasionally be necessary to dismiss an employee without
progressing through any earlier disciplinary measures.”

          General
Order 621.03 provides a “Discipline Decision Matrix” that lists ten possible
infractions and the recommended discipline upon the first, second, and third
occurrences of those infractions within a twelve-month period.  For example,
for a critical performance deficiency, the matrix recommends retraining,
probation, or a reprimand for the first occurrence; probation or a suspension
for the second occurrence; and a three-day suspension or termination for the
third occurrence.  For sexual harassment by inappropriate comments, the matrix
recommends discipline ranging from verbal counseling to a three-day suspension
for the first occurrence, a written reprimand to a three-day suspension for the
second occurrence, and a three-day suspension to demotion or termination for
the third occurrence.  For untruthfulness, the matrix simply recommends
termination for the first occurrence.

          Yelverton
made the ultimate decision to terminate appellant’s employment with Southlake. 
Under authority from Texas courts, we must primarily consider the rationale of
her decision in determining whether appellees rightfully prevailed on their
affirmative defense.  See Harris Cnty. v. Vernagallo, 181 S.W.3d 17, 26
n.15 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (declining to adopt the
“conduit” theory, which permits liability when one supervisor makes a
recommendation regarding an employee to another innocent supervisor who acts on
that recommendation without conducting any independent judgment); City of
Fort Worth v. Johnson, 105 S.W.3d 154, 169 (Tex. App.—Waco 2003, no pet.)
(“The trial court’s finding that Pete Nelson’s negative attitude caused Johnson’s
termination has no bearing on the outcome of this case.  Nelson did not have
the ultimate authority to either terminate or reinstate Johnson.”); see also
Costello v. Bank of Am., N.A., No. 14-06-00195-CV, 2007 WL 4303499, at *4
(Tex. App.—Houston [14th Dist.] Dec. 11, 2007, no pet.) (mem. op.) (“Costello
contends there is overwhelming evidence that Brugger expressed a negative
attitude . . . . Brugger, however, was not the decision maker in
Costello’s termination.”).[24]

          Yelverton
stated that she does not become involved in termination decisions until they
reach her level of the appeal process.  She explained, “I independently try to
determine if the totality of the information supports or does not support the
matters that are being appealed. . . .  I become the final decision-maker under
governing rules. . . .”  In Yelverton’s affidavit, she said,

My focus was on Charge Nos. 10 and 11 . . .
dealing with the use of the name Quentin Watkins by [appellant] in connection
with the second January 23, 2008 email which also claimed credit for having
sent the earlier January 9, 2008 email.

          . . . .

          . . .  The key charges against [appellant]
which were the basis for overruling his appeal were Charge Nos. 10 and 11 . . .
.  [Appellant] certainly knew that by sending an anonymous email . . . with a
number of complaints and with sensitive and confidential information, there
would certainly be an investigation conducted to determine the identity of the
sender.  Initially sending such an email in an anonymous fashion was
deceptive.  However, when [appellant] sent a second email January 23, 2008
claiming to [be] Quentin Watkins, this was yet another untruthful and deceptive
act. . . .

          . . .  While certainly any employee in any
business should be truthful as they carry out the business of their employer,
it is particularly important for a Police Officer to be truthful.  A Police
Officer will regularly write reports involving charges or potential charges or
investigations. . . .  A Police Officer will be called upon to give testimony
in various courts. . . .  It is my understanding that under appropriate
circumstances, in a criminal proceeding, a criminal defendant may have a right
to be informed that an Officer has been found to be untruthful, and such
information potentially can be used to impeach the Officer’s credibility . . .
.  I was concerned that if [appellant] felt that he could bend the truth or be
untruthful for purposes of a claim that he thought was righteous, this could
carry over into his work as a Police Officer and supervisor. . . .

          . . .  [Southlake’s charter] clearly provides
that any employee or appointed official is required to be truthful . . . . 
Southlake General Order § 603.04 requires employees to be truthful . . . .  The
City’s applicable disciplinary rules included in the General Orders manual
indicate that a Police employee will be terminated for a first time offense involving
untruthfulness . . . .

With
that background, Yelverton stated, “A Police Officer who is not truthful and
credible would be terminated for those reasons . . . regardless of any other
possible motivating factor.”  [Emphasis added.]  Yelverton explained that during
the time that she has worked for Southlake (since 1993) she was not aware of
any other police employee who was determined to be intentionally untruthful and
was allowed to continue employment.  In explaining the basis of her decision to
terminate appellant’s employment, Yelverton stated,

When I handled [appellant’s] appeal and acted as the
final decision-maker when I made my ruling . . . , I did not in any way
retaliate against [appellant] for engaging in whistleblowing.  There is no
doubt that [appellant] admitted that he sent an anonymous email and then later
attempted to cover up his involvement in the anonymous email by using the name
Quentin Watkins . . . .  Based on this deception and untruthfulness, I would
have taken my actions involving [appellant] solely on this information or
observation or evidence of deception and untruthfulness.  [Emphasis added.]

          Chief
Goolsby, who initiated appellant’s termination, and Blagg, who initially upheld
it, echoed Yelverton’s sentiments about the determinative effect of appellant’s
untruthfulness upon his discipline.  For example, Chief Goolsby stated in his
affidavit,

[T]he most significant charges against [appellant] that .
. . I thought should be sustained were the charges involving his untruthfulness
. . . .  I thought those charges were the most important because
there was no doubt that [appellant] had been untruthful. . . .

          . . .  Additionally, when the initial
administrative investigation was ongoing, [appellant] apparently realized he
was likely to be identified as the anonymous sender.  Therefore, instead of
stepping forward to identify himself as the sender, he continued his untruthful
deception by . . . pretend[ing] that Quentin Watkins had sent the first email
and second email. . . .

          . . .  Even if Watkins did give permission to
[appellant], I considered [appellant’s] action of covering up the true sender
to be deceptive and untruthful. . . .  

          . . .  [A]n Officer’s truthfulness and
credibility are essential to the Officer’s function as a Police Officer.

          . . .  A Police Officer who is not truthful and
credible would be terminated for those reasons regardless of any other possible
motivating factor.

          . . . .

          . . .  In short, regardless of whether or not
[appellant] could establish that he had whistleblower status, his admitted
deception and untruthfulness would have resulted in his termination . . . .

Like
Yelverton, Chief Goolsby stated that during the time he worked for Southlake
(since 2005), he was not aware of any police employee who was charged with intentional
untruthfulness, had that charge sustained, and was allowed to continue
employment.

          Blagg
said in his affidavit that it

is particularly important for a Police Officer to be
truthful.  A Police Officer will regularly write reports involving charges or
potential charges or investigations.  A Police Officer will, from time to time,
need to assist in preparing . . . sworn affidavits for purposes of obtaining
warrants . . . .  A Police Officer will be called upon to give testimony . . .
.  If a Police Officer is not truthful, then his coworkers and supervisors will
question his credibility . . . .  Courts and prosecutors may question the
Officer’s credibility if the Officer has been found to be untruthful. . . .

          . . .  A Police Officer who is not truthful and
credible would be terminated for those reasons . . . regardless of any other
possible motivating factor.

          . . . .

          . . .  What was most relevant to my decision
was the fact that [appellant] intended to deceive the Department and interfere
with or prevent the Department from finding out the identity of the sender of
the email.[[25]]

Captain
Daniels agreed with this sentiment, stating in his affidavit that regardless of
whether appellant “could establish that he had whistleblower status, his
admitted deception and untruthfulness should have resulted in his
termination.”  The evidence also demonstrates that people outside of
Southlake’s government viewed appellant’s untruthfulness with the same
seriousness that Yelverton, Blagg, Chief Goolsby, and Captain Daniels did; when
appellant looked for jobs with other police agencies after his firing from
Southlake, he was told that he would not be hired because he was fired for
untruthfulness.

          In
his brief, appellant appears to concede that Yelverton “terminated [him]
because he was untruthful when he sent the second email claiming to be retired
Officer Watkins.”  Appellant argues, however, that appellees cannot establish
their affirmative defense because “(1) the January 23, 2008 email is based on
information, observation, and evidence related to the fact that [he] made a
report; [and] (2) [appellees] cannot establish that the January 23, 2008 email
is the sole reason for [his] termination.”  First, we disagree that the
inevitable (according to appellees’ affidavits) termination of appellant’s
employment for untruthful statements within the January 23 e-mail is related to
the “fact that [appellant] made a report protected [under chapter 554 of the
government code] of a violation of law.”  See Tex. Gov’t Code Ann. § 554.004(b). 
Appellant’s whistleblower report was complete and was effectively protected
under chapter 554 at the time he sent the first, anonymous e-mail to Mayor
Wambsganss and Councilmember Hill on January 9.  From that time through January
23, he could have done nothing (to therefore remain anonymous until, at some
future point, he was asked about his role in sending the e-mail),[26]
or he could have truthfully taken responsibility for the January 9 e-mail;
instead, through the January 23 e-mail, he lied (either with or without
Watkins’s permission).  The lie was not a component of appellant’s making a
report protected by chapter 554; rather, as appellant has conceded, it was a
component of diverting the police department’s investigation.

          Second,
we disagree with appellant that to be entitled to their affirmative defense,
appellees must show that appellant’s January 23 e-mail was the sole basis for
his termination or that appellant’s whistleblower reports were not a basis for
the termination.  Rather, under the facts of this case, section 554.004(b)
required appellees to prove that disregarding any improper basis that they
might have had for terminating appellant, they would have terminated him
based on the proper basis of his untruthfulness.  See id.; Vela v.
City of Houston, 186 S.W.3d 49, 54–55 (Tex. App.—Houston [1st Dist.] 2005,
no pet.) (concluding that even assuming that the plaintiff’s allegations concerning
whistleblower retaliation were true, the city was entitled to summary judgment
because it proved that it would have nonetheless disciplined the employee for
falsifying records and violating city policies); see also Hernandez,
164 S.W.3d at 388–89 (explaining this rationale in the context of a workers’
compensation retaliation claim).  For this reason, as explained in Hernandez,
appellant’s circumstantial evidence of a possible retaliatory basis for his
termination does not defeat appellees’ entitlement to summary judgment because
it does not cast doubt that Chief Goolsby, Blagg, and ultimately, and most
importantly, Yelverton, would have fired him for his admitted untruthfulness; at
most, the evidence shows that there might have been more than one ground on
which appellees would have fired him.

          Referring
to Lieutenant Douglas (who did not have authority to decide appellant’s
discipline), appellant argues that the “only person not implicated by [his]
reports recommended that he not be terminated.”  For two reasons, we cannot see
the relevance of this fact to appellees’ affirmative defense.  First, although
Lieutenant Douglas did not recommend that appellant be terminated, she did
recommend that he be disciplined (by demotion and probation) on the basis that he
was untruthful in the January 23 e-mail.  Second, it is not imperative to appellees’
affirmative defense that Southlake was required to fire appellant for
untruthfulness or that every SDPS employee would have come to the same
termination decision that Yelverton did.  Instead, it is appellees’ defense,
based on the unambiguous, uncontroverted evidence they presented, that the
decision makers in this case—Chief Goolsby, Blagg, and Yelverton—would have uniformly
terminated him for untruthfulness regardless of any other factor.

          In
his brief, appellant relies in part on Moreno v. Texas A & M
Univ.-Kingsville, 339 S.W.3d 902 (Tex. App.—Corpus Christi 2011, pet.
filed).  In that case, Moreno, the university’s comptroller, had been fired
after she reported her belief that her supervisor had broken the law by
improperly receiving an out-of-state tuition waiver for his daughter.  Id.
at 905.  In its motion for summary judgment, the university

produced evidence that [the supervisor] had other
legitimate, non-retaliatory reasons for terminating Moreno’s employment,
including that Moreno:  (1) was unable to complete specific and complicated
budget-related tasks on her own; (2) did not provide budget reports to [the
supervisor] in a timely manner after he requested them; (3) interfered
with and delayed the hiring process for an engineer because she did not agree
with the salary that [the supervisor] proposed for him; (4) failed to provide
required information and services to other [university] departments in a timely
manner; and (5) was generally uncooperative and difficult to work with. .
. .

          Moreno produced evidence, however, that
these stated reasons for her termination were pretextual. 

Id. at
914 (emphasis added) (explaining that the university’s reasons could have been
pretextual because, in part, Moreno presented evidence that the university’s provost
believed her to be thorough, knowledgeable, ethical, and competent).  We have
not located evidence in this case that raises a genuine issue of material fact
that casts doubt on Yelverton’s statement that she would have fired appellant
for untruthfulness apart from any other motivation.  For example, we have not
found evidence that Yelverton (or Chief Goolsby or Blagg) failed to fire
someone who was similarly situated to appellant and who was found to be and
admitted to be untruthful.  See Hernandez, 164 S.W.3d at 389 (holding
that there was no causation in a workers’ compensation retaliation case because
the plaintiff did not present more than a scintilla of evidence that the employer’s
policy was not uniformly enforced or that the employer’s explanation for the
termination was false); Parker, 2011 WL 3918159, at *5 (“When an
employer provides proof that it terminates an employee pursuant to a uniformly
applied . . . policy, a terminated employee must provide competent evidence
that the employer treated him differently from similarly situated employees in
order to survive a summary judgment motion.”).

          Appellant
compares his firing to the discipline faced by two other Southlake employees: 
Kevin Northcutt and Lieutenant Kenny.  Yelverton’s affidavit described that
several years before appellant made his whistleblower complaints, Northcutt,
who worked in Southlake’s Public Works Department, made a whistleblower report
about that department’s wrongdoing.  Yelverton said that Northcutt’s
whistleblowing led to extensive investigations by the city and precipitated the
firing of a number of Southlake’s employees.  Because Northcutt was involved in
the wrongdoing, he was suspended for a period of time, but he continued to be
employed by the city for five years after that until he voluntarily resigned. 
We conclude that Northcutt’s continued employment with Southlake does not raise
a genuine issue of material fact that casts doubt on the reason for appellant’s
firing; Northcutt was not found to be untruthful, and he was not an employee of
the police department.

          Yelverton’s
affidavit also said of Lieutenant Kenny,

In one instance, former Police Lieutenant Michael Kenny
had faced several internal charges, and based on an initial determination
that he had been untruthful, his employment was terminated.  During the
appeal process, I determined that Michael Kenny may have stated information
incorrectly, but did not do so intentionally.  Therefore, I decided Kenny
had not been untruthful.  Michael Kenny’s employment was reinstated. 
[Emphasis added.]

Like
Northcutt, Lieutenant Kenny is not similarly situated with appellant.  Yelverton
ultimately found Lieutenant Kenny to not be untruthful, and it is indisputable
that appellant was untruthful when he wrote in the January 23 e-mail that
Watkins had sent the January 9 e-mail.  If anything, the evidence as to
Lieutenant Kenny’s initial discipline of termination for untruthfulness and
subsequent reinstatement when he was found to not be untruthful supports
appellees’ affirmative defense that they would have fired appellant for deceptiveness
and untruthfulness.[27]

          For
all of these reasons, based upon the summary judgment evidence that appellees
presented and upon the lack of evidence by appellant to raise a genuine issue
of material fact that he would not have been fired based on his untruthfulness,
we conclude that appellees conclusively proved their entitlement to summary
judgment on the affirmative defense of section 554.004(b), and we hold that the
trial court did not err by granting appellees’ motion for summary judgment and
plea to the jurisdiction.  See Tex. Gov’t Code Ann. § 554.004(b); Tex.
R. Civ. P. 166a(b), (c); Lueck, 290 S.W.3d at 883 (explaining that the elements
of a whistleblower claim may be considered to determine both jurisdiction and
liability).  We overrule appellant’s second issue, and because that issue is
dispositive of appellant’s claim under the Whistleblower Act, we decline to
address appellant’s other issues.[28]  See Tex. R. App.
P. 47.1.

Conclusion

          Having
overruled appellant’s second issue, which is dispositive in his appeal, we
affirm the trial court’s judgment.

 

 

 

TERRIE LIVINGSTON
CHIEF JUSTICE

 

PANEL: 
LIVINGSTON,
C.J.; WALKER and MCCOY, JJ.

 

MCCOY, J., concurs without
opinion.

DELIVERED:  May 31, 2012









[1]See Tex. Penal Code
Ann. §§ 37.10(a), 39.03(a) (West 2011).





[2]See Tex. Transp.
Code Ann. § 720.002(a) (West 2011) (prohibiting traffic offense quotas).





[3]Following its
investigation, in February 2008, the district attorney’s office issued a report
noting that a “sizeable faction” of Southlake’s police officers had serious
concerns about Chief Goolsby’s leadership.  The district attorney concluded
that the allegations had not established criminal events, but the report
stated, “[T]he conclusion of the investigation should not be taken as weight
for one side or the other in the ongoing debate of police practices in the
City.”  The report also stated that although the district attorney had
forwarded some concerns about the police department’s practices to Southlake’s
management, the district attorney did not have the “authority, the time, or the
resources . . . to investigate every one of the 56 officers in the department
with regard to vague rumors against them.”





[4]As the director of public
safety, Blagg oversaw the city’s police and fire divisions, which comprise the
SDPS.  Thus, Chief Goolsby was subordinate to Blagg.  Blagg was also the city’s
deputy city manager.





[5]Mayor Wambsganss and
Councilmember Hill stated that when they received the e-mail, they were aware
that the district attorney’s office was investigating activities in the police
department but were not aware of the specific subjects of the investigation or
the identity of the people who had complained to the district attorney. 
Yelverton stated that she was also aware of the district attorney’s
investigation and that appellant had been involved in the investigation. 
Yelverton explained that she “fully and completely cooperated with” the
district attorney’s office during the investigation.





[6]An SDPS general order
prohibits employees from recommending the “procurement of a particular product,
professional service, or commercial service.”





[7]Councilmember Hill swore
in an affidavit that her decision to turn over the January 9, 2008 e-mail to
SDPS was not retaliatory but was borne out of a concern that SDPS needed to be
aware of the e-mail’s allegations.  She and Mayor Wambsganss stated that they
did not interpret the January 9 e-mail as making a complaint under the city’s
ethics code because there was no reference to a particular provision of the
code and there was no request for the city council to take any particular
action.





[8]Chief Gooslby says that he
directed Captain Daniels to investigate the source of the e-mail but did not
participate in Captain Daniels’s investigation.





[9]In his affidavit,
appellant says that he sent the January 9 e-mail because he was required to
report unethical conduct to the city council; he claims that he sent the e-mail
anonymously for fear of retaliation.





[10]See Tex. Gov’t
Code Ann. §§ 554.001–.010 (West 2004); Tarrant Cnty. v. McQuary, 310
S.W.3d 170, 173 (Tex. App.—Fort Worth 2010, pet. denied) (“The Whistleblower
Act has a twofold purpose:  (1) protecting a public employee from retaliation
by her employer when, in good faith, the employee reports a violation of law,
and (2) securing lawful conduct on the part of those who direct and conduct the
affairs of public bodies.”).





[11]Captain Daniels alleged
that appellant had made disparaging remarks about Blagg’s, Chief Goolsby’s, and
Yelverton’s integrity in the January 9 e-mail.





[12]Captain Daniels alleged
that appellant had been untruthful, in part, by sending the January 23 e-mail
while claiming that Watkins had sent it along with January 9 e-mail.





[13]For example, Captain
Daniels asserted that appellant had committed forgery under the penal code by
using Watkins’s name on the January 23 e-mail.





[14]Captain Daniels alleged
that appellant had divulged confidential information about an employment
background investigation, the firing of Lieutenant Kenny, an internal affairs
investigation, a grand jury investigation, and an ongoing criminal
investigation.





[15]In her affidavit,
Yelverton stated that she considered the hostile work environment complaint
“very seriously,” that she directed Lanier to not dismiss the complaint on a
technicality, and that the City paid thousands of dollars for Lanier’s
investigation.





[16]Appellant voluntarily
took a polygraph examination on June 4, 2008, and the examiner determined that
appellant was not being deceptive when he stated that Watkins had told him that
he could use Watkins’s name to send the January 23 e-mail.  SDPS could have
required appellant to take a polygraph examination during the internal affairs
investigation.





[17]Appellant does not
challenge the trial court’s decision to grant summary judgment against his
claim under chapter 614 of the government code, and we therefore affirm the
summary judgment as to that claim.  See Torres v. Johnson, 91 S.W.3d
905, 908 n.3 (Tex. App.—Fort Worth 2002, no pet.) (explaining that we must
affirm summary judgments on unchallenged grounds).





[18]Under chapter 554, the
“law” includes state and federal statutes, local ordinances, and rules adopted
under statutes or ordinances.  Tex. Gov’t Code Ann. § 554.001(1).  Because we
hold below that appellees were entitled to summary judgment on an affirmative
defense that is unrelated to whether appellant’s reports were made in good
faith, we will not address the issue of good faith.  See Tex. R. App. P.
47.1.





[19]Appellant also objected
to much of appellees’ summary judgment evidence, but appellant’s issues on
appeal do not attack the admissibility of appellees’ evidence.





[20]Although the supreme
court discussed the issue of causation in Whistleblower Act cases in Zimlich
and in Hinds, the court did not discuss the effect of section
554.004(b)’s affirmative defense upon causation in either case because in both
cases, the allegedly retaliatory employment action occurred before the
effective date of section 554.004(b).  See Zimlich, 29 S.W.3d at 66–67; Hinds,
904 S.W.2d at 637.





[21]In the argument portion
of appellant’s summary judgment response in the trial court, he did not specify
the facts that he now relies upon on appeal to defeat appellees’ affirmative
defense.  “Generally, the nonmovant must expressly present to the trial court
any reasons for avoiding the movant’s right to summary judgment.”  Bassett
v. Am. Nat’l Bank, 145 S.W.3d 692, 696 (Tex. App.—Fort Worth 2004, no
pet.); see also Tex. R. Civ. P. 166a(c) (explaining that issues “not
expressly presented to the trial court by written motion, answer or other
response shall not be considered on appeal as grounds for reversal”).





[22]See Gray v. Nash,
259 S.W.3d 286, 291 (Tex. App.—Fort Worth 2008, pet. denied) (“When construing
a statute, our goal is to ascertain and give effect to the legislature’s intent
as expressed by the plain and common meaning of the statute’s words.”).





[23]Hernandez
concerned a claim under section 451.001 of the labor code, which states, in
part, that a person may not discharge or discriminate against an employee
because the employee has filed a workers’ compensation claim in good faith.  Id.;
see Tex. Labor Code Ann. § 451.001(1) (West 2006).  Plaintiffs in
retaliatory discharge claims under section 451.001 may rely on the same types
of circumstantial evidence of causation as plaintiffs in Whistleblower Act
claims.  See Louis v. Mobil Chem. Co., 254 S.W.3d 602, 611 (Tex.
App.—Beaumont 2008, pet. denied); see also Cont’l Coffee Products Co. v.
Cazarez, 937 S.W.2d 444, 450 (Tex. 1996) (comparing the Whistleblower Act
to section 451.001 and stating that the same principles of causation should
apply to both statutes).





[24]Citing a United States
Supreme Court case that concerned liability under a federal statute, appellant
argues that a “review of the animus of all persons involved in investigating or
terminating [appellant] is necessary to determine whether the good faith report
was a cause of the retaliatory conduct.”  See Staub v. Proctor Hosp.,
131 S. Ct. 1186, 1192–93 (2011).  But even in that case, the Court recognized
that if the employer’s ultimate action is taken for “reasons unrelated to the
supervisor’s original biased action . . . then the employer will not be liable.” 
Id. at 1193.





[25]Although upon appellees’
objection, the trial court excluded deposition excerpts that appellant attached
to his summary judgment response, we note that even if we were to consider
those excerpts, they are consistent with the basis of appellees’ affirmative
defense.  In a deposition taken in connection with a lawsuit that Lieutenant
Kenny brought against Southlake, Blagg said that appellant was fired because he
“sent an email to the Mayor and a member of the City Council alleging to be
another retired police officer.”  Captain Daniels testified in a similar deposition
that the issue that “ultimately got [appellant] terminated was a truthfulness
issue because he identified himself as . . . being somebody
else.”





[26]Thus, we disagree with
appellant that the effect of sustaining appellees’ affirmative defense is to
“subject all anonymous reporters to retaliatory treatment.”  Appellees’
evidence demonstrates that appellant would have been fired apart from his
initial anonymity because he lied.





[27]We note that this
evidence also seems to contradict appellant’s claim that he was fired because
he was a whistleblower.  Appellant has noted that Lieutenant Kenny and
Northcutt were also whistleblowers, and according to Yelverton, Lieutenant
Kenny and Northcutt retained their employment with Southlake.





[28]In his fourth issue,
appellant contends that the trial court abused its discretion by excluding some
of his summary judgment evidence upon appellees’ objections.  We have
considered the summary judgment evidence specifically described within
appellant’s fourth issue, and we have determined that the evidence does not
affect the resolution of appellant’s second issue.  Appellant’s first and third
issues discuss other grounds upon which the trial court might have granted
appellees’ summary judgment motion.